IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 7, 2003

## STATE OF TENNESSEE v. CHARLES VANTILBURG, III

**Direct Appeal from the Criminal Court for Shelby County**
**No. 00-12715     Joseph B. Dailey, Judge**

_____

**No. W2002-01480-CCA-R3-CD - Filed January 13, 2004**

_____

The defendant was convicted of second degree murder and sentenced to twenty years in the Tennessee Department of Correction. He contends on appeal that 1) the evidence was insufficient to prove that the killing was "knowing," 2) the trial court erred in admitting a photo of the victim while he was alive, allowing a "memo of understanding" to be read into evidence, and refusing to admit a report of an expert witness into evidence, 3) the State made improper remarks during closing argument, 4) the trial court gave erroneous jury instructions as to the definition of "knowingly," and 5) the sentence was improper. We conclude that the definition of "knowingly" given by the trial court improperly lessened the State's burden of proof and was not harmless beyond a reasonable doubt. Therefore, we reverse and remand for a new trial, based on the erroneous jury instruction given by the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed and Remanded**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and NORMA MCGEE OGLE, JJ., joined.

Leslie Ballin, Memphis, Tennessee, for the appellant, Charles Vantilburg, III.

Paul G. Summers, Attorney General and Reporter; Thomas E. Williams, III, Assistant Attorney General; William L. Gibbons, District Attorney General; Thomas Henderson and Karen Cook, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The defendant, Charles Vantilburg, III, was convicted of second degree murder, a Class A felony, and sentenced to twenty years in the Tennessee Department of Correction. This appeal timely followed. The defendant contends on appeal that 1) the evidence was insufficient to prove that the killing was "knowing," 2) the trial court erred in admitting a photo of the victim while he

was alive, allowing a "memo of understanding" to be read into evidence, and refusing to admit a report of an expert witness into evidence, 3) the State made improper remarks during closing argument, 4) the trial court gave erroneous jury instructions as to the definition of "knowingly," and 5) the sentence was improper. We reverse and remand for a new trial, based on the erroneous jury instruction given by the trial court.

## Facts

On the evening of Thursday, June 22, 2000, Toby Gibson, the victim, did not show up for a scheduled softball game. The following morning, he did not show up for work at the Bartlett Fire Department. His friends and co-workers were concerned because of the victim's uncharacteristic absences from both the game and work. Charles Vantilburg, III, the defendant, was the victim's friend and co-worker. Terri Tibbs, the victim's mother, came by the fire department with the victim's father and girlfriend looking for him on Friday. Tracy Barnett, a Bartlett fireman, said that, during work on Tuesday night, June 20, 2000, the victim told him that he was going by the defendant's house the next day to collect some money owed to him by the defendant. Police investigators arrived at the fire station and began inquiring as to what might have happened to the victim. The defendant told them that the victim had come by his house around 4:30 p.m. on Thursday to collect money the defendant owed him. He said that the victim asked that he accompany him to the mall to "back him up" while the defendant met some people there to buy steroids. The defendant told them that he did not go with the victim and did not see the victim after he left that day.

After learning that the victim's abandoned vehicle had been located, the defendant contacted the police on Sunday, June 25, 2000, and confessed to killing the victim. An agreement was reached between the authorities and the defendant on Tuesday, June 27, 2000. The State agreed to charge no higher than second degree murder and recommend a sentence of fifteen years. In exchange, the defendant agreed to tell them the truth about what had happened, turn over the weapon used to kill the victim, and tell them the location of the body. In a videotaped interview that was played for the jury, the defendant stated that he called the victim on the morning of Thursday, June 22, 2000, to let him know that he could come by later in the day to collect the money that the defendant owed him. The victim arrived at the defendant's house around 4:00 that afternoon while the defendant was outside in his yard. When the victim asked the defendant for his money, the defendant told him that he only had $100 with him at the time. He said that he could get the rest of the money later that day or the next morning. The victim became angry with the defendant, and an argument ensued near the entrance to the defendant's shed. The men began shoving each other, and the defendant pulled his handgun, a Glock semiautomatic loaded with hollow point bullets, from its holster. After ordering the victim to leave, the defendant said that the victim pushed him again and the gun discharged. The defendant stated that he did not intend to fire the weapon and had no intention of killing the victim. However, Randall Alberson, a co-worker of the victim and the defendant, testified that he visited the defendant in jail after the killing and talked with him for more than three hours. He said that the defendant told him that he intended to shoot the victim but did not intend to kill him. The victim fell to the ground and died of a gunshot wound to the back of the neck. Dr. O'Brien Cleary Smith, the

Shelby County medical examiner, testified that the version of events given by the defendant was consistent with his medical findings.

The defendant wrapped the victim's body in a blue tarp and attempted to clean up the blood with a towel. He placed the bloody towel with the body and wrapped it up in the tarp. Realizing that the victim's vehicle was still in the defendant's driveway, he left the body in the shed and drove the vehicle to the Wolfchase Mall. The defendant then called Raoul Laguna, who worked for the defendant, and asked Laguna to pick up the defendant at the mall and take him back to his house. Without knowing what had just transpired, Laguna complied and drove the defendant back to the defendant's house. While the victim's body remained in the shed, the defendant took his two children to a local fast food restaurant to get something to eat. On the return trip home, the defendant stopped off at a Dollar General Store to purchase hydrogen peroxide to clean up the blood in the shed. The defendant arrived back at the scene of the killing and attempted to clean up some of the blood on the ground. He then dragged the body wrapped in the tarp out of the shed and placed it in the back of his utility van. While driving the van, the defendant called Laguna and asked if he could leave the van behind Laguna's sister's house because the van had a flat tire. Laguna agreed, and the defendant parked the van, with the victim's dead body inside, behind the sister's house. She gave the defendant a ride back to his house in her vehicle.

Laguna testified that on the morning of Saturday, June 24, 2000, he went to the defendant's house to borrow some coolers for his child's birthday party. Laguna said that the defendant asked him to take a gun with him and he refused. Later that day, Laguna drove the defendant to pick up the van at his sister's house. On the way to get the van, the defendant dropped off the vehicle he was driving at AutoZone. Laguna then drove the defendant to his sister's house. The defendant told Laguna not to follow him when he left. However, Laguna did attempt to follow the defendant, because the van had a "stinking smell" and "a whole bunch of flies came out" when the defendant rolled down the window. Laguna followed the defendant as he drove south on Elvis Presley Boulevard. He lost sight of the defendant as he drove into Mississippi. Laguna returned home and was arrested at his child's birthday party later that day. The police stated that they had received an anonymous phone call that he was involved in the disappearance of the victim. Laguna was released the following Monday.

The defendant said that he drove the van to Desoto County, Mississippi, and dumped the body in a gully on the side of the road. He returned to the AutoZone where he had left his other vehicle and abandoned the van. He later told police that he took the gun used to kill the victim to his mother's house and asked his mother to get rid of it. The defendant's mother testified that she took the gun to the defendant's grandmother's house and hid it. The defendant stated that he had "added" the part about the victim wanting him to go with him to buy steroids after he found out that the victim's vehicle had been found. The defendant had a permit to carry a gun and apparently often carried a handgun.

Steve Scott, a firearms expert, testified on behalf of the State. Scott testified that the weapon used by the defendant was in proper working order. He stated that the Glock does not have any type

of external safety mechanism. In other words, the shooter does not have to manually move anything from side to side in order to discharge the weapon. The Glock has three types of internal safety devices including a trigger safety, firing pin safety, and a drop safety. These mechanisms are designed to prevent unintentional discharges occurring because of the gun being dropped or hit on the side. He stated that it was impossible for the gun to fire unless the trigger is pulled. Charles J. Key, a firearms expert for the defense, testified that the Glock's trigger pull distance is approximately five tenths of an inch. He said that the first four tenths is "slack," and a shooter really only encounters resistance during the last one tenth of an inch. He said that someone could have the trigger pulled back the first four tenths of an inch without even realizing it, especially in a high stress situation. Key testified as to his experience with Glocks while working for the Baltimore Police Department. He performed a study of unintentional discharges at the Baltimore Police Department and determined that Glocks had a rate of unintentional discharges five times higher than revolvers.

**Analysis**

The defendant was convicted of second degree murder. He contends on appeal that 1) the evidence was insufficient to prove that the killing was "knowing," 2) the trial court erred in admitting a photo of the victim while he was alive, allowing a "memo of understanding" to be read into evidence, and refusing to admit a report of an expert witness into evidence, 3) the State made improper remarks during closing argument, 4) the trial court gave erroneous jury instructions as to the definition of "knowingly," and 5) the sentence was improper.

I. Sufficiency of the Evidence

The defendant contends on appeal that the evidence was insufficient to prove that the killing was "knowing." When a defendant challenges the sufficiency of the evidence, the standard of review is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 319, (1979); State v. Evans, 838 S.W.2d 185, 190-91 (Tenn. 1992). On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Elkins, 102 S.W.3d 578, 581 (Tenn. 2003). This Court will not re-weigh the evidence, reevaluate the evidence, or substitute its evidentiary inferences for those reached by the jury. State v. Carey, 914 S.W.2d 93, 95 (Tenn. Crim. App. 1995). Furthermore, in a criminal trial, great weight is given to the result reached by the jury. State v. Johnson, 910 S.W.2d 897, 899 (Tenn. Crim. App. 1995).

Once approved by the trial court, a jury verdict accredits the witnesses presented by the State and resolves all conflicts in favor of the State. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). The credibility of witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted exclusively to the jury as trier of fact. State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Brewer, 932 S.W.2d 1, 19 (Tenn. Crim. App. 1996). A jury's guilty verdict removes the presumption of innocence enjoyed by the defendant at trial and raises a presumption of guilt. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant

then bears the burden of overcoming this presumption of guilt on appeal. State v. Black, 815 S.W.2d 166, 175 (Tenn. 1991).

Second degree murder is defined as "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). For second degree murder, a defendant must be aware that his or her conduct is reasonably certain to cause death." State v. Page, 81 S.W.3d 781, 788 (Tenn. Crim. App. 2002). It is undisputed in this case that the defendant killed the victim by shooting him in the neck. The defendant's theory at trial was that the death resulted from an unintentional discharge; therefore, the killing was not "knowing." The trial court also instructed the jury that "knowingly" "is also established if it is shown that the defendant acted intentionally." See Tenn. Code Ann. §§ 39-11-106 (18), -302(a). According to Randall Alberson, the defendant stated that he intended to shoot the victim. In contrast, the defendant's statement indicates that he did not intend to fire the weapon. Accrediting the testimony of the witness presented by the State, a reasonable jury could have concluded that the defendant knowingly killed the victim. Additionally, the defendant's extensive efforts to cover up the shooting and conceal evidence indicate that the killing was knowing. This issue is without merit.

II. Admission of Evidence

The admission of evidence is a matter entrusted to the sound discretion of the trial court, and the trial court's ruling on an evidentiary issue will not be reversed absent a clear showing of an abuse of that discretion. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). The error will not result in reversal "unless the error affirmatively appears to have affected the result of the trial on the merits, or considering the whole record, the error involves a substantial right which more probably than not affected the judgment or would result in prejudice to the judicial process." State v. Harris, 989 S.W.2d 307, 315 (Tenn. 1999)(citations omitted).

The defendant first argues that the trial court erred in admitting a photograph of the victim while he was alive. "[A] photograph of the victim while alive [is] relevant to the state's case-in-chief in proving that the person murdered was the same person named in the indictment." State v. Carruthers, 35 S.W.3d 516, 577 (Tenn. 2000) (citing State v. Nesbit, 978 S.W.2d 872, 901-02 (Tenn. 1998)). We conclude that the trial court did not abuse its discretion in admitting the photograph of the victim while he was alive.

The defendant next argues that the trial court erred in allowing Detective Doug Bailey to read the "memo of understanding" into evidence because it was not relevant. Relevant evidence is evidence that tends to make a material fact more or less probable. Tenn. R. Evid. 401. The trial court allowed the memo of understanding to come into evidence in order for the jury to understand the context of the defendant's statement. The trial court allowed the witness to read the entire "memo of understanding" to the jury as follows:

> This agreement is by and between the state of Tennessee and [the defendant] with the advice and presence of counsel, Mr. Leslie Ballin. [The defendant] is currently in custody of the Bartlett Police Department awaiting charging in the criminal homicide

of [the victim]. [The defendant] agrees to waive his constitutional rights and give a full and truthful statement to investigators concerning the criminal homicide of [the victim]. [The defendant] will make good faith - - will make a good faith effort to help investigators locate and recover the body of [the victim]. In consideration of the above, the state of Tennessee will not charge any offense higher than murder second degree. The statement of [the defendant] and will - - and all evidence will be taken into consideration and the appropriate charge will be presented. But in no event will any charges more serious than murder in the second degree be presented. If the weapon used is turned over to authorities, the state will not prosecute any close blood relatives of [the defendant] for any concealment of said weapon. If the - - if in the reasonable opinion of the district attorney general, [the defendant] breaches this agreement in any material respect, this agreement is null and void. There are no other agreements or understandings between the parties.

The statement was relevant to show that the defendant did not divulge the location of the body and weapon out of remorse. It was relevant to let the jury know that his motives were not purely altruistic. We conclude that the memo was relevant, and the trial court did not abuse its discretion in allowing the memo to be read into evidence. This issue is without merit.

The defendant also argues that the trial court erred in not admitting the report prepared by the defense's expert witness concerning unintentional discharges of Glocks in the Baltimore Police Department because the report was relevant. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. The report was based on the expert's experience with the Baltimore Police Department. The trial court allowed the witness to be questioned about the report but would not allow the defense to get into specific details. The trial court did not abuse its discretion in refusing to admit a report that contained factual situations significantly different than those presented in the present case, because the report may have misled the jury. This issue is without merit.

III. Closing Argument

The defendant contends that the State made improper remarks during closing argument. In determining whether statements made by the State constitute reversible error, it is necessary to determine whether the statements were improper, and if so, whether the improper statements affected the verdict. See State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978); Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965). An appellate court should consider the following five factors in evaluating whether improper comments affected the verdict to the prejudice of the defendant:
1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.
2. The curative measures undertaken by the court and the prosecution.
3. The intent of the prosecutor in making the improper statement.
4. The cumulative effect of the improper conduct and any other errors in the record.

5. The relative strength or weakness of the case.
Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

The defendant argues that the following statement made by the State during closing argument and objected to by the defense amounts to reversible error. "Lest we forget, this trial is also about little Toby. Well, he was five foot nine, not much shorter than I am. In fact, young Toby - - [argument interrupted by objection]." The defendant objected to the State's use of the term "little Toby," and the trial court overruled the objection. However, the State did not use the term again, thereafter referring to him as "young Toby." After considering the Judge factors listed above, we cannot conclude that the single reference to "little Toby" affected the verdict.

The defendant also argues that the trial court erred in admitting another phrase used by the State in closing argument. The State made the following remark after reading from the indictment that the defendant's offense "was committed against the peace and dignity of the State of Tennessee." "There are only 12 people in the world who can restore that peace and dignity." As with the previous statement, the defendant simply makes the argument that the statement was made "to inflame the passions of the jury." After considering the Judge factors listed above, we cannot conclude that the statement affected the verdict. This issue is without merit.

IV. Jury Instructions

In defining the mental state of "knowingly" in the second degree murder and voluntary manslaughter jury instructions, the trial court instructed the jury as follows: "A person acts 'knowingly' if that person acts with an awareness either: (1) that his conduct is of a particular nature; or (2) that a particular circumstance exists." See Tenn. Code Ann. §§ 39-11-106(20), -302(b). The trial court also instructed the jury that "knowingly" "is also established if it is shown that the defendant acted intentionally." Id. -106(18), -302(a) The trial court did not instruct the jury on the portion of the definition of "knowing" which provides that "[a] person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Id. -106(20), -302(b). The defendant contends that this instruction constitutes plain error and requires reversal.

The defendant did not object to the instruction nor include this issue in his motion for new trial. Generally, a defendant waives the right to challenge a jury instruction when the defendant did not object to the instruction and did not include it in the motion for new trial. Tenn. R. App. P. 3(e); State v. Kendricks, 947 S.W.2d 875, 885 (Tenn. Crim. App. 1996). However, an error which has affected the substantial rights of a defendant may be noticed at any time at the discretion of the appellate court where necessary to do substantial justice. Tenn. R. Crim. P. 52(b); State v. Taylor, 992 S.W.2d 941, 944 (Tenn. 1999). The plain error doctrine applies where the trial court fails to give a jury charge on matters characterized as "fundamental," despite the fact that the defendant did not request the omitted instruction. State v. Stephenson, 878 S.W.2d 530, 554 (Tenn. 1994).

Second degree murder is defined as "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). The term "knowing" is defined by statute as follows:

"Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

Tenn. Code Ann. §§ 39-11-106(a)(20), -302(b). The Tennessee Supreme Court has explained that a knowing second degree murder is a "result-of-conduct" offense. State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000). Therefore, the nature of the conduct that causes death or the manner in which one is killed is inconsequential under the second degree murder statute. Id. Because a knowing second degree murder is strictly a "result-of-conduct" offense, "a jury instruction that allows a jury to convict on second degree murder based only upon awareness of the nature of the conduct or circumstances surrounding the conduct improperly lessens the state's burden of proof. For second degree murder, a defendant must be aware that his or her conduct is reasonably certain to cause death." Page, 81 S.W.3d at 788.[1] This Court has suggested the following definition of "knowingly" for second degree murder: "'Knowingly' means that a person acts with an awareness that [his][her] conduct is reasonably certain to cause the death of the alleged victim." Id. at 788. The instruction given by the trial court in the present case, entirely omitting the result of the conduct element, was clearly error. See State v. Keith T. Dupree, No. W1999-01019-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 65, *9 (Tenn. Crim. App., at Jackson, Jan. 30, 2001) (holding that jury instruction identical to the one in the present case was plain error).

We must now determine whether the erroneous jury instruction given by the trial court was harmless error. A defendant has the constitutional right to complete and accurate jury instructions on the law; the failure to do so deprives a defendant of the constitutional right to a jury trial. State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). The omission in jury instructions of an element of the offense is subject to constitutional harmless error analysis; whether the State can prove harmless error beyond a reasonable doubt. State v. Walker, 29 S.W.3d 885, 893 (Tenn. Crim. App. 1999). "[A]n erroneous jury instruction, which misstates the applicable conduct element of an offense and lessens the state's burden of proof, is likewise subject to constitutional harmless error analysis." Page, 81 S.W.3d at 789. Applying the above to the present case, we must determine whether, if the proper definition of knowing as suggested in Page had been used, the record contains evidence leading to a contrary result. See Ducker, 27 S.W.3d at 899 (citing Neder v. United States, 527 U.S. 1, 18-19, 199 S. Ct. 1827, 1838-39, 144 L. Ed. 35, 53-54 (1999)).

In Page, the defendant was convicted of second degree murder for causing the death of the victim by striking him in the back of the head with a baseball bat. 81 S.W.3d at 782. On appeal, this

---

[1]The trial in this case occurred approximately two months before the Page decision was rendered. However, we have applied the Page decision retroactively to cases that were in the "pipeline" at the time of that decision. State v. Henry Mitchell Dixon, No. E2002-00731-CCA-R3-CD, 2003 Tenn. Crim. App. LEXIS 902, *45(Tenn. Crim. App., at Knoxville, Oct. 22, 2003)(applied where trial occurred almost a year prior to Page).

Court concluded that the trial court erred by including "nature-of-conduct" and "nature-of-circumstances" definitions of knowingly in its jury instructions and that the trial court's error was not harmless because the defendant's trial defense had been that he was intoxicated and unable to appreciate the consequences of his conduct at the time he hit the victim with the baseball bat. Id. at 789-90. However, this Court explained in Page:

> We recognize that in many, if not most, homicide trials, the *mens rea* jury instructions utilized in this case would be harmless error. If a victim is shot at point blank range with a twelve gauge shotgun while asleep, and the defense is the defendant was not the shooter, then the erroneous instruction would likely be harmless. In such a situation, *mens rea* is not a disputed issue at trial. Similarly, if causation is not disputed in a homicide trial, the failure to instruct the jury on causation may well be harmless. See State v. Farmer, 66 S.W.3d 188, 206 (Tenn. 2001).

81 S.W.3d at 789. In Page, the trial court's jury instruction error was not harmless because *mens rea* was a disputed issue at trial and part of the defendant's defense. Id. at 790.

In the instant case, the State contends that any error in the jury instruction given was harmless and relies on the cases of State v. Tony Martin, No. W2001-02221-CCA-R3-CD, 2003 Tenn. Crim. App. LEXIS 89 (Tenn. Crim. App., at Jackson, Feb. 7, 2003) and State v. Allen Lee Dotson, Sr., No. M2001-01970-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 884 (Tenn. Crim. App., at Nashville, Oct. 21, 2002). However, these cases are distinguishable from the present case. In Dotson, the defendant admitted that the killing of the victim was intentional. 2002 Tenn. Crim. App. LEXIS 884, *12. The defendant in the present case contends that the shooting was accidental. In Martin, the trial court included the "result-of-conduct" definition in the jury instructions. 2003 Tenn. Crim. App. LEXIS 89, *21. In the present case, the trial court completely omitted the "result-of-conduct" definition of "knowingly."

In Dupree, the sole issue was whether the killing was knowing or accidental. 2001 Tenn. Crim. App. LEXIS 65, *13. The defendant in that case got into an argument with his wife. Id. at *3-4. He pointed a gun at her, and the gun went off. Id. He claimed that the shooting was accidental. Id. The trial court in that case gave a jury instruction that was identical to the instruction given in the present case. Id. at *7-8. This Court concluded "that the inapplicable definitions of 'knowing' relating to second degree murder, combined with the failure to instruct on the proper applicable definition of 'knowing,' was prejudicial to the defendant." Id. at *14. The Court reversed and remanded for new trial based on the erroneous jury instruction. Id.; see Page 81 S.W.3d at 789-90 (finding reversible error where *mens rea* was disputed element and erroneous instruction regarding definition of "knowingly" was given); Dixon, 2003 Tenn. Crim. App. LEXIS 902, *44-46 (finding reversible error where the trial court gave erroneous definition of "knowingly" and *mens rea* was a disputed issue). In the present case, the defendant conceded an unlawful and unjustified killing. As in Dupree, the only real issue at trial was whether the shooting was knowing or accidental. We are unable to conclude that the erroneous jury instruction was harmless beyond a reasonable doubt. Accordingly, we must reverse and remand for a new trial.

V. Sentencing

The defendant contends on appeal that the trial court erred in the application of enhancement and mitigating factors. This Court's review of the sentence imposed by the trial court is *de novo* with a presumption of correctness. Tenn. Code Ann. § 40-35-401(d). This presumption is conditioned upon an affirmative showing in the record that the trial judge considered the sentencing principles and all relevant facts and circumstances. State v. Pettus, 986 S.W.2d 540, 543 (Tenn. 1999). If the trial court fails to comply with the statutory directives, there is no presumption of correctness and our review is *de novo*. State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997). The burden is upon the appealing party to show that the sentence is improper. Tenn. Code Ann. § 40-35-401(d), Sentencing Commission Comments. In conducting our review, we are required, pursuant to Tennessee Code Annotated section 40-35-210, to consider the following factors in sentencing:

(1) [t]he evidence, if any, received at the trial and the sentencing hearing; (2) [t]he presentence report; (3) [t]he principles of sentencing and arguments as to sentencing alternatives; (4) [t]he nature and characteristics of the criminal conduct involved; (5) [e]vidence and information offered by the parties on the enhancement and mitigating factors in §§ 40-35-113 and 40-35-114; and (6) [a]ny statement the defendant wishes to make in the defendant's own behalf about sentencing.

It appears from the record that the trial court considered the appropriate sentencing criteria; therefore, our review is *de novo* with a presumption of correctness. The defendant argues that the trial court erred in considering enhancement factors not listed in Tennessee Code Annotated section 40-35-114. The "enhancement factors" referred to by the defendant involve facts proven during trial and information contained in the pre-sentence report. The trial court stated that it was considering the severe impact on the friends and family of the victim, the defendant's lack of assisting the victim even though he was a paramedic and claimed the shooting was accidental, and the defendant's efforts to involve others in the crime. As noted above, the trial court may properly consider the evidence presented at trial and the pre-sentence report in determining the specific sentence. Tenn. Code Ann. §§ 40-35-210 (b)(1), (2). The trial court apparently did not use the factors to "enhance" the sentence but to set the actual sentence itself. The defendant also argues that the presence of applicable mitigating factors required the sentence to be below the presumptive sentence of twenty years. Contrary to the defendant's assertion, the trial court did apply the applicable mitigating factors including the defendant's lack of a prior record and the crime was committed under unusual circumstances. Tenn. Code Ann. §§ 40-35-113(11), -210 (b)(2). The trial court did not find that the defendant assisted the authorities in recovering the body of the victim. Id. -113(10). The defendant only divulged the location of the body after an agreement was reached several days after the killing. Immediately after the shooting, the defendant went to extraordinary lengths to cover up any evidence of the shooting or the location of the body, dumping it in another state. The trial court correctly found that this mitigating factor should not apply, because the defendant's actions were not consistent with the purpose of the factor.

Even though there were applicable mitigating factors and no applicable enhancement factors, the trial court could have still properly sentenced the defendant to the presumptive sentence of

twenty years.. <u>See</u> Tenn. Code Ann. § 40-35-210(d) (for a Class A felony, when there are applicable mitigating factors and no enhancement factors, the sentence shall be at or below the midpoint in the range). The weight given to each enhancement or mitigating factor is in the discretion of the trial court, assuming the trial court has complied with the purposes and principles of the sentencing act and its findings are supported by the record. <u>State v. Madden</u>, 99 S.W.3d 127, 138 (Tenn. Crim. App. 2002). The statutes prescribe no particular weight for an enhancement or mitigating factor. <u>State v. Gosnell</u>, 62 S.W.3d 740, 750 (Tenn. Crim. App. 2001). A defendant's sentence "is not determined by the mathematical process of adding the sum total of enhancing factors present then subtracting from this figure the mitigating factors present for a net number of years." <u>State v. Alder</u>, 71 S.W.3d 299, 306 (Tenn. Crim. App. 2001) (quoting <u>State v. Boggs</u>, 932 S.W.2d 467, 475 (Tenn. Crim. App. 1996)). Additionally, the wrongful application of one or more enhancement factors by the trial court does not necessarily lead to a reduction in the length of the sentence. <u>State v. Winfield</u>, 23 S.W.3d 279, 284 (Tenn. 2000). The defendant has failed to show that the presumptive sentence of twenty years imposed by the trial court was improper.

## Conclusion

The jury instruction given by the trial court defining "knowingly" was erroneous. We cannot conclude that the erroneous instruction was harmless beyond a reasonable doubt. Therefore, we reverse and remand for a new trial.

_____
JOHN EVERETT WILLIAMS, JUDGE
